Frank A. BETTUCCI, Plaintiff,

v.

UNITED STATES of America,
et al., Defendants.

No. Civ. 90–0463 (RCL).

United States District Court,
District of Columbia.

March 26, 1998.

Frank A. Bettucci, Arlington, VA, pro se.

Diane Marie Sullivan, Assistant United States Attorney, United States Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on defendants' Motion to Affirm the Decision of the Foreign Service Grievance Board ("FSGB"). On March 12, 1989, plaintiff Frank A. Bettucci was mandatorily retired as an employee of the Foreign Service in the Agency for International Development ("AID"). Bettucci appealed the AID's decision to the FSGB and the FSGB affirmed the AID's decision. Bettucci subsequently filed this suit for review of the conclusion reached by the FSGB. Upon consideration of the submissions of the parties and the relevant law, defendants' motion to affirm the decision of the Foreign Service Grievance Board will be granted.

## I. *Background*

In 1966, plaintiff Frank Bettucci entered the Foreign Service and was employed by the Agency for International Development ("AID" or "Agency") on a limited appointment basis, grade FSLR–4. During his tenure with the agency, Bettucci served in varying employment capacities throughout the world in locations including Vietnam, Haiti, Burundi, Upper Volta, and Washington, D.C. In 1981, his grade was adjusted to grade FS–02 and in 1983 he was promoted to grade FS–01.

After his promotion to grade FS–01, Bettucci elected to compete to enter the Senior Foreign Service. In November 1987, the Senior Threshold Selection Board ("STB") ranked plaintiff in the lower 5% of all career Foreign Service Officers in grade FS–01. The Board subsequently referred Bettucci's evaluation file to the 1987 Performance Standards Board ("PSB") pursuant to 22 U.S.C. § 4008.[1] This Board concluded that Bettucci did not meet the requisite standards of a grade FS–01 officer and it was recommended to the Director of Personnel that he be mandatorily retired from the Foreign Service. The Director of Personnel concurred with the Board's recommendation and on January 19, 1988, the Director informed Bettucci that he failed to meet the standards of his class and as such, he would be mandatorily retired on March 12, 1988 pursuant to § 608(b) of the Foreign Service Act of 1980. *See* 22 U.S.C. § 4007(c)(1).[2]

---

1. Bettucci was rated by an annual selection board for promotion on the basis of performance. Threshold Selection Board rankings are used for awarding promotion to those candidates whose performance is determined to be superior and the rankings also identify substandard performers. Those individuals identified to be substandard performers are submitted to the Performance Standard Board and this Board identifies those employees whose demonstrated performance would warrant their involuntary retirement. The employees are appraised of such a determination and the reasons supporting this designation. According to statute, the employees may then either appeal to the Special Review Board or file a grievance with the Foreign Service Grievance Board. *See* 22 U.S.C. § 4008; 22 U.S.C. § 4131(a).

 Specifically, section 4008 provides:
 (a) The Secretary shall prescribe regulations concerning the standards of performance to be met by career members of the Service who are citizens of the United States. Whenever a se-

lection board review indicates that the performance of such a career member of the Service may not meet the standards of performance for his or her class, the Secretary shall provide for administrative review of the performance of the member. The review shall include an opportunity for the member to be heard.

(b) In any case where the administrative review conducted under subsection (a) of this section substantiates that a career member of the Service has failed to meet the standards of performance for his or her class, the member shall be retired from the Service.
22 U.S.C. § 4008.

2. This section provides in relevant part:

 Any member of the Service—
 (1) whose maximum time in class in subsection(a) of this section expires and who is not promoted to a higher class or combination of classes, as the case may be ... shall be retired from the Service.
 22 U.S.C. § 4007(c)(1).

In response to this determination, Bettucci filed a grievance with the AID which the Agency eventually denied in its entirety. This grievance asserted the following claims: (1) that the 1987 Senior Threshold Selection Board violated its Precepts by low ranking Bettucci within his class; (2) that the 1987 Performance Standard Board violated its Precepts by recommending that plaintiff be mandatorily retired; (3) that the Senior Threshold Selection Board and the Performance Standard Board improperly considered Bettucci's corridor reputation; (4) certain portions of Bettucci's Employee Evaluation Reports ("EER") contained inaccurate, erroneous, and falsely prejudicial materials which wrongfully influenced the Senior Threshold Selection Board and the Performance Standard Board in making their recommendations concerning him; (5) the AID failed to follow its own rules and regulations governing the assignment of Bettucci to his posts of duty; (6) the AID failed to provide Bettucci with adequate training to enable him to remain competitive in his position; and (7) the AID violated its own rules and regulations by the manner in which it implemented the Performance Standard Board's recommendation that Bettucci be mandatorily retired from the Foreign Service. Bettucci presented this grievance to the AID and after an investigation and review of his submissions, the agency affirmed the decision imposing mandatory retirement on him.

In October 1988, Bettucci appealed the AID's decision to the Foreign Service Grievance Board ("FSGB" or "Board") and on March 10, 1989, the AID granted Bettucci's request for prescriptive relief. This stay was subsequently revoked at the Agency's request on May 30, 1989 and Bettucci's mandatory retirement became effective on June 30, 1989.

The original grievance presented to the Board by Bettucci included numerous complaints with some dating back to his entry into the Service in 1966. In light of the statutory time limitations for filing grievances contained in section 1104(a) of the Foreign Service Act, 22 U.S.C. § 4134, and the large quantity of disparate material presented to the Board, the Board requested a prehearing meeting of the parties on February 22, 1989. Upon examination of the issues and motions before it, the Board affirmed its prior ruling as to which issues had been properly raised for consideration before the Board in its order of March 26, 1989. The Board decided that the various financial claims presented by Bettucci in his original submission to the Agency should be considered separately from issues related to the Agency's recommendation that Bettucci be mandatorily retired. The Board issued a decision denying the financial claims on January 29, 1990.

The Board proceeded to identify the substantive issues related to his mandatory retirement and conducted a separate hearing on these issues. In its May 14, 1990 decision, the Board identified the issues it considered as follows:

I. Whether (AID) violated the rules, regulations, and/or procedures governing the assignment process in reference to the plaintiff.

II. Whether [AID] violated the rules, regulations, and/or procedures governing the training opportunities granted or denied [plaintiff].

III. Whether the Employee Evaluation Reports ("EERs") relied on by AID in the proceedings to mandatorily retire [plaintiff] were inaccurate, erroneous, or falsely prejudicial.

IV. Whether the 1987[STB] violated applicable precepts, rules, regulations, or policies in low-ranking [plaintiff] and referring him to the Performance Standards Board ("PSB").

V. Whether the 1987[PSB] violated applicable precepts, rules, regulations or policies in recommending that [plaintiff] be mandatorily retired.

VI. Whether improper matters, including but not limited to [plaintiff's] "corridor reputation", were factors in or considered in the proceedings to mandatorily retire (him).

VII. Whether [AID violated applicable rules, regulations or policies in the decision to mandatorily retire [plain-

tiff] or in the implementation of that decision].

FSGB's May 14, 1990 Op. at 3.

The Board rejected each of Bettucci's claims after a hearing and its consideration of the arguments raised by both Bettucci and the Agency. Bettucci filed a complaint in this court seeking judicial review of the FSGB's January 29 and May 14, 1990 decisions. This court referred Bettucci's complaint to United States Magistrate Deborah Robinson for preparation of proposed findings of fact and recommended disposition of the defendants' motion to affirm the FSGB's findings.

Magistrate Judge Robinson answered each of the above issues in the negative and affirmed the conclusions reached by the Board. In response to Magistrate Judge Robinson's decision, Bettucci filed his objections to Magistrate Judge Robinson's Report and Recommendation. The issue presently before this court is whether, upon de novo review, the evidence supports the findings of law and fact as reached by Magistrate Judge Robinson in order to permit this court to adopt the Magistrate Judge's Report and Recommendation.

## II. *Analysis*

### A. *Standard of Review*

In 1980, Congress established "the framework for hiring, promoting, and retaining Foreign Service officers." *Molineaux v. United States,* 12 F.3d 264, 264 (D.C.Cir. 1994) (citing Foreign Service Act of 1980, Pub.L. No. 94–465, 94 Stat.2071 (1980)). The Foreign Service implemented an "up or out system" with officers granted career appointments after a probationary period. Once an officer has secured a career appointment, the officer is required to be promoted into the Senior Foreign Service within twenty years. If such a promotion is not attained, the officer is involuntarily retired. *Id.* (citing 22 U.S.C. § 4007).

The Foreign Service Act sets forth detailed procedures pursuant to which the Foreign Service Grievance Board is to conduct hearings at the behest of an individual subject to an adverse employment decision within the Foreign Service. *See* 22 U.S.C. § 4136. These provisions require the FSGB to conduct a hearing at the request of a grievant in any case which involves disciplinary action or the retirement of a grievant from the Service under section 4007 or 4008. As stated, Bettucci, plaintiff in the instant case, was mandatorily retired pursuant to section 4008. Therefore, he was entitled to a hearing under section 4136. As required by statute, the hearing was conducted by the FSGB and Bettucci presently seeks review in this court of the FSGB's decision to affirm the Agency's determination to mandatorily retire him.

Judicial review of a final decision of the Foreign Service Grievance Board is set forth in section 1110 of the Foreign Service Act, as amended. *See* 22 U.S.C. § 4140. This section provides for judicial review of the final decisions of the Board in federal district court according to the provisions of the Administrative Procedures Act.[3] The pertinent section of the APA, section 706(2), defines the possible standards of judicial review of the Grievance Board's decision:

[T]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557

---

**3.** Section 4140 provides:

Any aggrieved party may obtain judicial review of a final action of the Secretary or the Board on any grievance in the district courts of the Untied States in accordance with the standards set forth in chapter 7 Title 5. Section 706 of Title 5 shall apply without limitation or exception.

22 U.S.C. § 4140.

or otherwise reviewed on the record of an agency hearing provided by statute;

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

■ In determining which standard to apply, a reviewing court must determine whether the Board's action constitutes formal or informal adjudication. Formal adjudications are those required by statute to be considered through on-the-record proceedings and involve the development of a record through a trial-type hearing. *Smith v. Office of Civilian Health and Med. Program of Uniformed Servs.*, 97 F.3d 950, 954 (7th Cir.1996). In essence, formal adjudications are designed to produce a record that is to be the basis of the agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). An informal adjudication, by contrast, is "a residual category including all agency actions that are not rulemaking and that need not be conducted through 'on the record' hearings." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 361 n. 37 (D.C.Cir.1981).

■ In the instant case, the FSGB is mandated by statute to conduct a hearing at the request of a Foreign Service employee who has been subjected to retirement pursuant to section 4007 or 4008. The FSGB procedures as set forth in this statute require testimony .to be given under oath, provide for examination and cross-examination of witnesses, permit the reception of oral or documentary evidence by the Board, and require a verbatim transcript to be made of any hearing to be included in the record of proceedings. In light of the nature of the mandatory hearing conducted by the FSGB, this court concludes that such hearings must be characterized as formal adjudications for the purpose of determining what standard of review should be applied to the Board's ultimate determination.

■ Because it is this court's conclusion that the process employed by the Board is tantamount to a formal adjudication, judicial review of the Grievance Board's decision is limited to determining whether the Board's decision was supported by substantial evidence and was procedurally correct. In this case, Bettucci has the burden of showing that the Grievance Board made an error that was a substantial factor in causing his mandatory retirement. See *Reiner v. United States*, 686 F.2d 1017, 1021 (D.C.Cir.1982). In reviewing the Board's determination, this court is not permitted to substitute its judgment for the Board's decision. *See Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. However, the Court must give the Board's determination a "thorough, probing, in-depth review." *Id.* at 415, 91 S.Ct. 814.

■ Although the court is required by statute to give great deference to the determinations of the Board, the court may set aside findings of the Board if they are not supported by substantial evidence. Substantial evidence requires that the evidence in support of an agency finding must be sufficient to support the conclusion of a reasonable person after considering all of the evidence in the record as a whole, not just the evidence that is consistent with the agency's finding. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight ... [and] courts [must] consider the whole record." *Id.* The Board's determinations are presumed to be valid, but only when they are supported by substantial evidence and are not contrary to statutory, procedural, or constitutional requirements. *See Motor Vehicle Manufacturers v. Ruckelshaus*, 719 F.2d 1159 (D.C.Cir.1983).

B. *Analysis of the Board's Determination to Mandatorily Retire Bettucci*

As stated, the determinations of the FSGB must be supported by substantial evidence and may not be contrary to statutory, procedural, or constitutional requirements. Bettucci's opposition to defendants' motion to affirm the decisions of the FSGB challenges the ultimate conclusions reached by the Board in its January 29, 1990 and May 14, 1990 decisions and asserts various procedural and statutory deficiencies in the hearings conducted by the Board prior to these deci-

sions. Accordingly, this court will first consider the procedural and statutory arguments set forth by Bettucci and subsequently consider the remaining substantive challenges to the conclusions reached by the Board as presented by Bettucci.

### 1. *Bettucci's Claims of the Board's Procedural and Statutory Deficiencies*

Bettucci raises five preliminary issues, each alleging that his hearing before the Board was procedurally deficient in some manner. These issues include the following:

(1) Whether the Board erred by wrongfully limiting its jurisdiction to hear all issues raised by Bettucci.

(2) Whether the Board erred by revoking prescriptive relief during the proceedings.

(3) Whether the Board failed to ensure a full and fair hearing and failed to properly give Bettucci the consideration due a pro se litigant.

(4) Whether the Board abused its discretion in refusing to permit Bettucci to call essential witnesses and whether the Board permitted the Agency to intimidate Bettucci's witnesses.

(5) Whether bias on the part of the Board deprived Bettucci of a fair hearing.

### a. *Whether the Board Erred by Limiting Its Jurisdiction to Consider Only Those Issues that Were Not Time Barred*

■ In his initial grievance, Bettucci raised ten separate claims for financial reimbursement allegedly incurred during the course of his tenure with the Agency. The Board held that six of the issues were time barred pursuant to section 1104(a) of the Foreign Service Act, 22 U.S.C. § 4134, because they were not filed within three years of their occurrence as required by statute.

Section 1104(a) states that:

(a) A grievance is forever barred unless it is filed with the Department within a period of 3 years after the occurrence or occurrences giving rise to the grievance or such shorter period as may be agreed upon by the Department and the exclusive representative. There shall be excluded from the computation of any such period any time during which, as determined by the [Board], the grievant was unaware of the grounds for the grievance and could not have discovered such grounds through reasonable diligence.

22 U.S.C. § 4134(a).

In support of his argument that the Board erred by limiting its jurisdiction to actions that were not time barred, Bettucci contends that the grievances he has complained of are in the nature of "continuing violation[s] of the rules, regulations, and policies designed to deprive Bettucci of his right to be treated fairly and equally to his peers in the foreign service of the United States." Opp. to Mot. to Affirm at 64. Bettucci claims that the continuing nature of the alleged mistreatment that he has received constitutes a pattern of harassment and reprisal. He admits that "a number of issues that (he) raised were based on incidents outside of the three (3) year statute of limitations for the presentation of grievances." *Id.* at 69. Paradoxically, Bettucci then contends in the very next sentence that the record is clear that he did present grievances on these issues within the applicable time frame, but that these grievances were totally ignored by the Agency.

Aside from the conclusory allegations set forth in Bettucci's opposition to the motion to affirm the Board's conclusion, the record is devoid of any showing that the Board's jurisdictional determinations were improper or not supported by substantial evidence. The Board's preliminary examination of jurisdictional issues is mandated by regulation and was proper in this case. *See* 22 C.F.R. § 904.2.[4] Bettucci has failed to set forth any evidence establishing that he was unaware of the grounds for the claims documented in the

---

4. Section 904.2 provides that "[i]f an Agency, in its final review, has questioned whether a complaint constitutes a grievance, the Board will make a preliminary determination of its jurisdiction unless the Board concludes that resolution of the question of jurisdiction should be deferred until the Board has compiled a record of proceedings or held a hearing on the merits of the case." 22 C.F.R. § 904.2(a).

grievance or unable to discover them through the exercise of reasonable diligence. Indeed, defendants are correct in their assertion that Bettucci presents no causal connection between the alleged mistreatment he received and his failure to present the untimely issues in a timely manner. Accordingly, it is this court's conclusion that the Board did not err in limiting its jurisdiction to the grievances that were timely filed.

b. *Whether the Board Properly Revoked Bettucci's Prescriptive Relief*

■ On March 10, 1989, the Agency granted Bettucci's request to stay his involuntary separation pending a final resolution of his grievance. On May 30, 1989, the Board granted the Agency's request to revoke the stay. Bettucci claims that the revocation of the stay was contrary to the regulations governing the award of prescriptive relief and therefore, the Board's actions were improper. Moreover, Bettucci contends that "the Board prejudged evidence prior to it being heard by the Board and had already arrived at a decision prior to the conclusion of the hearing." Opp. to Mot. to Affirm at 73.

The applicable statute and regulation regarding prescriptive relief provide that:

(a) If the Board determines that the agency is considering involuntary separation of the Grievant . . . which is related to a grievance pending before the Board, and that such action should be suspended, the agency shall suspend such action until the Board has ruled on the grievance.

22 C.F.R. § 904.4(a). *See also* 22 U.S.C. § 4136(8). As this regulation indicates, the suspension of any action pending final determination by the Board is an action taken at the Board's discretion.

■ In the application for revocation of the prescriptive relief, the Agency argued that equitable principles should govern such a determination. In light of the absence of any case law construing this provision of the Foreign Service Act, it is this court's conclusion that it was not inappropriate for the Board to rely on equitable principles in determining whether Bettucci's prescriptive relief should be revoked. In this case, the balance of the equities tipped in favor of revoking the prescriptive relief at issue. The Board considered the cost to the Agency of continuing to compensate Bettucci during the remainder of the proceedings and the likelihood that Bettucci would suffer irreparable harm should the prescriptive relief be revoked.

Because Bettucci failed to claim any compensable damage resulting from the revocation of the prescriptive relief, it cannot be said that the revocation resulted in irreparable harm. Had Bettucci prevailed in his grievance claim, an award of backpay, attorney's fees, the correction of his record, and other relief could have been awarded to him. As such, Bettucci would have been fully compensated despite his claims to the contrary. Given the fact that the Board affirmed the Agency's decision to mandatorily retire Bettucci, any alleged error resulting from the revocation of the prescriptive relief could be characterized as harmless.

C. *Whether the Board Failed to Afford Bettucci a Full and Fair Hearing Given His Pro Se Status*

During the course of the proceedings before the Board, Bettucci claims that he was forced to terminate the services of his retained counsel and that he proceeded pro se after unsuccessful efforts to locate alternate counsel. Bettucci contends that despite assurances from the Board that his pro se status would be taken into consideration, the Board failed to accommodate him. Bettucci asserts that the deprivation of a fair hearing is evidenced by the refusal of the Board to allow Bettucci to complete his oral testimony and the frequent interruption of this testimony, by permitting attorneys for the Agency to object to testimony offered by Bettucci and to cross-examine Bettucci during the course of his testimony, and "by the obvious harsh rush to judgment [by the Board] without consideration of developing a full and complete record on which a well reasoned decision could be made." Opp. to Mot. to Affirm at 80.

The record is devoid of any evidence that the Board failed to consider Bettucci's pro se status in the treatment of either Bettucci or

the matter before the Board. Indeed, Bettucci's current criticisms of the manner in which the Board handled his case are belied by his own statement on the record made during the course of the proceedings:

> I would like to add to that and say I certainly appreciate your patience in my lack of experience and greenness in conducting these interviews and presenting my testimony, because I know you have been very kind and patient with me on that, and I appreciate that.

Record of Proceedings ("ROP"), Part III, May 15, 1989 Trans. at 299.

■ Bettucci's questioning of the cross-examination conducted by counsel for the Agency during his own testimony is rebutted by a party's right as specified by statute to conduct cross-examination of witnesses at the hearing. *See* 22 U.S.C. § 4136(3) ("Each party ... shall be entitled to examine and cross-examine witnesses at the hearing ...."). There is nothing in the record to suggest that the examination of Bettucci was conducted in a harassing or vexatious manner. Bettucci's attempts to call into question the manner in which counsel for the Agency voiced objections to certain evidence is equally without merit. In addition to there being no evidence in the record to support such a claim, at the conclusion of the hearing before the Board, the Chairman commented:

> I want to commend Counsel, too, and I think you [Bettucci] will agree that they have—particularly when you were not represented by counsel—they have entertained some of the things that they would have instinctively object[ed] to if you had counsel. I know I could see some restraint on their part. That should be acknowledged. It may not have seemed that way to you because you did catch at times a deluge of objections, but there again we tried to protect you from that, too.

ROP, Part III, May 15, 1989 Trans. at 300.

Such observations by the Chairman and the lack of evidence to the contrary in the record lead this court to conclude that Bettucci was afforded a full and fair opportunity to proceed given his pro se status. The Board not only acted properly, it also gave more than ample consideration to Bettucci's

situation in this case. *See* FSGB May 14, 1990 Op. at 67–70 (detailing the Board's treatment of Bettucci).

### d. *Whether the Board Acted Improperly with Respect to Bettucci's Witnesses*

Bettucci next contends that the Agency and the Board acted improperly in the treatment of Bettucci and his witnesses. The improper treatment alleged by Bettucci centers on the number of witnesses he was permitted to call at the hearing before the Board and allegations that the Board permitted the Agency to intimidate Bettucci's witnesses.

### i. *The Board's Limiting of the Number of Witnesses to Be Called by Bettucci*

■ The Board required both the Agency and Bettucci to submit lists of proposed witnesses prior to the hearing. The Agency submitted a list of twenty-two witnesses and that list was approved by the Board after reduction of the number of witnesses to fifteen. Bettucci submitted a list of seventy-seven witnesses and in response, the Board required Bettucci to make a showing of relevance for these witnesses and to indicate the length of time that each witness was expected to testify. In sum, Bettucci claims that "the Board gave total discretion to the Agency to call any witness it wished but limited the Grievant to a few witnesses." Opp. to Mot. to Affirm at 81.

The Board acted properly in taking steps to limit the number of witnesses and to ensure the relevancy of the testimony to be offered by each witness. By regulation and statute, the Board may:

> (a) ... in its discretion order a prehearing conference of the parties (which may be presided over by any member) for the purpose of considering:
>
> . . .
>
> (4) identification of witnesses the parties may wish to call and the intended scope of their testimony; limitation on the number of witnesses; and arrangement for the appearance of witnesses.

22 C.F.R. 906.5(a)(4). *See also* 22 U.S.C. § 4136. Moreover, the Board is charged by applicable regulations to act as a gatekeeper in determining whether the presence of a witness is required at trial. *See* 22 C.F.R. § 906.8(b) ("If the Board determines that the actual presence of such witness at the hearing is required for just resolution of the case, the witness shall be made available at the hearing, with necessary costs and travel expenses paid by the Agency which is a party to the hearing."). In the instant case, the Board requested that both parties limit the number of witnesses after review of the parties' witness lists. *See* ROP, Part II at 733. ("The panel is concerned about the number of witnesses the parties have proposed."). However, this request was completely disregarded by Bettucci.

In response to the requests made by the Board for the parties to reexamine the proposed witnesses, Bettucci actually *increased* the number of his proposed witnesses. On February 24, 1989, Bettucci submitted a Proposed Amended Witness List containing a list of seventy-two named witnesses. *Id.* at 785–90. On March 24, the Board made its request that the parties reexamine the number of proposed witnesses. *Id.* at 733. On April 7, 1989, Bettucci submitted a list of seventy-seven proposed witnesses without any explanation for the increase in number. *Id.* at 708–14. Furthermore, Bettucci failed to clearly and specifically identify the nature of the proposed testimony of these witnesses or its relevancy. *Id.* In contrast, the Agency reduced its proposed witness list to fifteen after the Board made its request. *Id.* at 718–22. Accordingly, the Board was well within its discretion in limiting the number of witnesses to be called by the parties and there is no indication in the record that the Board abused its discretion in making this determination. Moreover, Bettucci has made no effort to demonstrate that any witness or potential testimony that the Board excluded was relevant or that any exclusion was harmful to his case.

### ii. *Agency Intimidation of Witnesses*

 Bettucci also alleges that the Agency with the Board's assistance engaged in actions designed to intimidate the witnesses Bettucci intended to call at the hearing. Bettucci states "[i]t is clear that each of the witnesses employed by the Agency is under its control and the entity to whom each of them must depend for a paycheck ... the very fact that they may be asked to testify on behalf of the Grievant in an action against the Agency is threatening." Opp. to Mot. to Affirm at 84. Furthermore, Bettucci asserts that the Board improperly granted the Agency the right to be present at any time that Bettucci interviewed witnesses who were Agency employees.

The regulations governing access to witnesses in hearings before the Board are designed to ensure that litigants have access to potential witnesses who are employees of the Foreign Service. *See* 22 C.F.R. § 903.10 ("The grievant ... shall be given access to witnesses employed by the foreign affairs agencies."). However, a grievant is required to advise the agency of the agency witnesses to be interviewed. *Id.* There is no prohibition within the rules preventing an Agency representative from attending the interview of a witness. Moreover, Bettucci has failed to present any extraordinary circumstances in the instant case that would warrant the exclusion of an Agency representative from such an interview. Bettucci simply draws the unsubstantiated conclusion that "[t]he effect of the Agency's counsel being present during the Grievant's attempt to prepare for the hearing was to intimidate the witnesses and prevent a fair assessment of the testimony, memory and effectiveness of the witnesses." Opp. to Mot. to Affirm at 83.

The Board provided Bettucci with a thorough explanation of the procedures to be followed with respect to access to witnesses and the presence of Agency counsel when the witnesses were being interviewed by Bettucci. The Chairman explained that Bettucci would be afforded the opportunity to meet with an employee from the Agency without an Agency representative if the employee chose to do so. ROP, Part III, April 26, 1989 Trans. at 221. However, the Chairman made it clear to Bettucci that the employees had a right to have counsel present when being interviewed by Bettucci. Specifically, the Chairman stated:

[T]o the extent that you have asked for the Board's intervention in this matter of contacting witnesses, we have tried to map out a fair procedure, which will recognize the interests of the Agency in their own employees, and sometimes the employees are reluctant to talk to outsiders.... If they say the wrong thing, are they going to be subject to some kind of reprisal? ... They have the right to ask that counsel be present when ... they are being asked questions about the business of the Agency, they have the right to rely on counsel.... If the employee is willing to meet with you one on one without counsel present, that is fine, and should be permitted, and the Board would insist that that be allowed.

*Id.* at 223. No evidence has been presented by Bettucci suggesting that this procedure was not followed by the Board or that such a procedure was prejudicial to Bettucci's case. As such, Bettucci has failed to identify any actions taken by the Board with respect to his proposed witnesses that could be characterized as improper. The record is similarly devoid of any evidence suggesting any improper action by the Board in this regard.

### e. *Whether Bias on the Part of the Board Deprived Bettucci of a Fair Hearing*

■ Finally, Bettucci asserts that "[f]rom the inception of this matter before the Foreign Service Grievance Board, it has been clearly evident that the Board was biased against the Grievant and in favor of the Agency." Opp. to Mot. to Affirm at 85. This assertion is supported, in part, by Bettucci's belief that the Board "suggested" to the Agency that it should raise certain jurisdictional challenges to portions of Bettucci's grievances and that the Agency followed this suggestion. Bettucci also contends that the Board proceeded to rule on the jurisdictional issue without ruling on his request for an increased amount of time to respond to the jurisdictional issues raised. Bettucci states that his overseas assignment precluded him from adequately responding to the matters before the Board and that the Board only

"grudgingly" permitted him an additional week to respond to the jurisdictional issues.

Furthermore, Bettucci claims that the Board precluded him from conducting proper discovery and unfairly limited the scope of his questioning in comparison to the limits imposed on the Agency. Bettucci concludes his argument on this issue by stating that "[t]he record is replete with instances in which the Board showed their bias in favor of the Agency." Opp. Mot. to Affirm at 86.

Bettucci fails to cite with specificity even one instance of bias contained in the record. Moreover, this court's own review of the record has failed to uncover any hint that the Board exhibited any degree of bias in favor of the Agency or against Bettucci. In sum, Bettucci's claims on this issue amount to an argument aptly described in the words of the Immortal Bard as being "full of sound and fury and signifying nothing."[5]

### f. *Conclusion*

In sum, it is this court's conclusion that Bettucci's claims that the hearing before the Board was procedurally or statutorily defective are without merit.

### 2. *Review of the Substantive Issues Considered by the Board*

As previously stated, the Board considered the various financial claims presented by Bettucci separate from his contentions concerning mandatory retirement. In its January 29, 1990 decision, the Board rejected Bettucci's financial claims and in its May 14, 1990, the Board affirmed the Agency's decision to involuntarily retire Bettucci. Accordingly, the court will consider separately whether each of the Board's decisions are supported by substantial evidence from the record.

### a. *The Board's January 29, 1990 Decision*

The Board's January 29, 1990 decision addresses Bettucci's financial claims concerning the alleged denial of travel and other monetary benefits accrued during his tenure with the Agency. An individual raising griev-

---

**5.** William Shakespeare, *Macbeth*, Act V, Scene 5, lines 32–33.

ances other than those concerning disciplinary actions must comply with the applicable time limit for filing such grievances and must meet the burden of proof set forth in the applicable regulations. The applicable time limit for filing non-disciplinary grievances is set forth in section 1104 of the Foreign Service Act. 22 U.S.C. § 4134. This section requires that grievances be filed within a period of three years after the occurrence giving rise to the grievance and this time limit may be equitably tolled. Section 905.1 of the Foreign Service Grievance Board Regulations provides the burden of proof that a grievant must meet and states that:

> (a) In all grievances other than those concerning disciplinary action, the grievant has the burden of establishing, by a preponderance of the evidence, that the grievance is meritorious.

22 C.F.R. § 905.1(a).

In the instant case, Bettucci raised ten separate claims for financial reimbursement. In the original grievance submitted by Bettucci, these claims were numbered eight through fifteen and included the following:[6]

8. Unfair treatment for shipment of a POV ["personally owned vehicle"] whereby grievant had to pay the cost of shipment of the POV to post.

9. Unfair treatment for processing a travel voucher for a dependant's 180 TDY where the Controller intimidated grievant to change costs of the claim.

10. Unfair treatment for a travel voucher where grievant turned in an unused air ticket and was charged for the cost of the ticket.

11. Unfair treatment for lost annual leave when leave carry-over was approved by the mission.

12. Unfair treatment by PER for charging grievant the cost of airfare to post when PER neglected to issue travel authorization for grievant and family's travel with AID/W.

13. Unfair treatment for PER holding grievant and family at home leave residence without orders for unusually long periods of time. Requests for administrative leave were never responded to.

14. Unfair treatment for assigning grievant to a post with less than adequate medical facilities when his dependent infant was refused medical clearance to travel and grievant paid cost of airfare for dependent travel to post.

15. Unfair treatment for approved overtime/comptime which was later denied.

ROP, Part V, Vol. 1 at 2. The Board rejected each of these claims for at least one of the following reasons: either the complaint was barred by the applicable statute of limitations or Bettucci failed to carry his burden of proof by demonstrating by a preponderance of the evidence that the claims were meritorious.

The Board's opinion concerning these financial claims rejected claims 8, 9, 10, 11, 13, and 14 as time barred. Claim 8, involving the shipment of a second privately-owned vehicle, was rejected by the Agency because Bettucci did not file the grievance on this until after four years after the Agency rejected his application. The Board agreed that the grievance was not timely filed and that Bettucci provided no evidence to show that he was entitled to shipment of a second vehicle. A review of the Bettucci's grievance confirms that Bettucci filed his request outside the applicable time limit and moreover, his submission failed to establish by a preponderance of the evidence that he was entitled to shipment of a second vehicle. *See* ROP, Part V., Vol. 2 at 365–80.

Claims 9 and 10 were rejected by the Board on similar grounds and stem from the same course of events. Bettucci filed a grievance concerning claim 9 indicating that he was not properly reimbursed for transfer expenses in 1983 and for subsequent medical

---

6. In his March 8, 1988 Grievance Submission, Bettucci listed these financial claims and numbered the claims 8 through 15. ROP, Part V, Vol. 1 at 2–3. The Board continued to refer to these claims according to Bettucci's initial numbering system despite Bettucci's "restructuring" and "renumbering" of the claims. ROP, Part I at 76. For the sake of consistency, this court will continue to refer to the claims in this manner.

expenses incurred in 1984 after members of his family were medically evacuated from Burundi in November 1983. With respect to this claim, Bettucci alleges that he should be reimbursed for medical expenses that were not paid by the Office of medical Services or by the insurance company. *Id.* at 397–400. Bettucci also contended in claim 10 that he was entitled to be reimbursed for expenses incurred by other members of his family in 1984 after his wife was medically evacuated from Burundi in November 1983. These issues were grieved in Bettucci's submission of July 26, 1988—more than four years after the agency's actions regarding the transfer and medical expenses incurred in 1983 and 1984. The Board properly concluded that these claims were time barred.

Claim 11 requested reimbursement for lost annual leave in Burundi and was rejected by the Agency because it was similarly time barred. Bettucci claimed that he lost 152 hours of annual leave carry-over in December 1983 after this time was canceled by the OAR/Burundi. Bettucci also alleges that additional leave was lost in April 1984. The record clearly indicates that claim 11 was submitted outside the applicable three year time limit. Accordingly, the Agency and the Board did not err in rejecting this claim. *See* ROP, Part V, Vol. 2 at 353–54.

Claim 13 refers to Bettucci's request of June 6, 1984 for administrative leave to be used that same year to re-establish his family in Fort Lauderdale. Although the Agency rejected this request in 1984, Bettucci failed to grieve this issue until July 1988. Therefore, the grievance was clearly filed outside the three year limit. *See* ROP, Part V, Vol. 2 at 355–59.

Finally, claim 14 concerned Bettucci's request for a travel voucher for his dependent son. Again, this claim was considered time barred by both the Agency and the Board. The voucher was submitted and rejected in 1983 and Bettucci's grievance on this matter was not submitted until 1988. Bettucci's submissions are devoid of any evidence indicating that he brought the grievance on this issue within the applicable time limit. As such, the Agency and the Board did not err in rejecting this claim as time barred. *Id.* at

350–52. *See generally* ROP, Part I, 75–78 (FSGB's Op. at 2–3) (detailing the Board's consideration of the time barred claims); ROP, Part III, May 11, 1989 Trans. at 245 (transcript of hearing before the Board and Board stating "[w]e don't have the authority to entertain the claim [for reimbursement] because it was a matter that could have been raised at any time after it was denied and you waited beyond the three years to grieve it.").

The remaining claims are summarized in the Board's decision as arising from "generalized allegations that the agency subjected him to mismanagement, neglect, lack of equal consideration, etc." and that his claims "were the result of the agency's refusal to grant him fair and equal consideration." ROP, Part I at 79. In one specific example presented in the Board's decision, Bettucci's submission for claims totaling $17,957.57 are supported by his assertion that "he was not treated fairly, due to neglect, error or omission." *Id.* Indeed, Bettucci prefaced his submission setting forth his claims for financial reimbursement in the following manner:

> The following details describe a series of Personnel administrative actions which grievant alleges have not been given fair consideration or treatment due to neglect, error or omission. These additional claims are requested as relief under this grievance.

ROP, Part V, Vol. 2 at 347.

After reviewing this and other submissions, the Board concluded "[the evidence presented by Bettucci] is not the kind of evidence that would enable the Board to determine whether [he] is legally entitled to the amounts claimed." *Id.* The Board characterized his submissions as "a disjointed narrative with many unsubstantiated allegations" and stated that "[he] has failed to show in this instance, or in other monetary claims, the specific basis or authority on which his claim rests." The Board ultimately concluded that "[Bettucci] has not met the burden of proof, under section 905 of the Board's regulations, to establish by a preponderance of the evidence that his complaints ... are meritorious." *Id.*

Upon review of the record, it is this court's conclusion that the Board's January 29, 1990 decision rejecting Bettucci's financial claims is supported by substantial evidence. The record is clear that Bettucci failed to demonstrate that his claims were filed within the applicable time limits or that the applicable time limits should be tolled. Notwithstanding that the majority of his financial claims were time barred, the record similarly demonstrates that he failed to establish by a preponderance of the evidence that any of the financial claims were meritorious. *See, e.g.,* ROP, Part III. May 11, 1989 Trans. at 244 ("That is a claim for reimbursement for your son's travel in the period June 1983 ... You attached a travel claim that was not dated. There is no signature of an approving official. There is no evidence that the travel voucher was ever actually submitted."); *id.* at 250 (indicating that Bettucci failed to "show how much money was involved" in his grievance claims); *id.* at 251 (discussion between Board members, counsel for the Agency, and Bettucci regarding unsuccessful search conducted by members of the Board for documents that demonstrated that Bettucci's claims were timely filed). Moreover, the actual grievance of March 8, 1989 containing Bettucci's financial claims and the accompanying attachments confirms that the conclusions reached by the Board are supported by substantial evidence. *See* ROP, Part V, Vol. 2 at 347–97 (Bettucci's March 8, 1988 grievance); ROP, Part V, Vol. V at 550–817 (accompanying attachments referenced in Bettucci's March 8, 1998 grievance). Therefore, it is this court's conclusion that the Board's decision regarding Bettucci's financial claims was correct.

b. *The Board's May 14, 1989 Decision*

The Board's May 14, 1990 opinion addressed the substantive issues related to the mandatory retirement of Bettucci. As discussed in Part I of this opinion, the Board identified the issues it considered as follows:

I. Whether [AID] violated the rules, regulations, and/or procedures governing the assignment process in reference to [Bettucci].

II. Whether [AID] violated the rules, regulations, and/or procedures governing the training opportunities granted or denied [Bettucci].

III. Whether the Employee Evaluation Reports ("EERs") relied on by AID in the proceedings to mandatorily retire [Bettucci] were inaccurate, erroneous, or falsely prejudicial.

IV. Whether the 1987[STB] violated applicable precepts, rules, regulations, or policies in low-ranking [Bettucci] and referring him to the Performance Standards Board ("PSB").

V. Whether the 1987[PSB] violated applicable precepts, rules, regulations or policies in recommending that [Bettucci] be mandatorily retired.

VI. Whether improper matters, including but not limited to [Bettucci's] "corridor reputation", were factors in or considered in the proceedings to mandatorily retire [him].

VII. Whether [AID] violated applicable rules, regulations or policies in the decision to mandatorily retire [Bettucci] or in the implementation of that decision.

FSGB May 14, 1990 Op. at 3. The court will now consider whether the conclusions reached by the Board on these issues were supported by substantial evidence from the record.

i. *Whether the Agency Violated the Rules, Regulations, and/or Procedures Governing the Assignment Process in Reference to Bettucci*

■ In his Post–Trial Brief submitted to the Board and his opposition to the motion to affirm the Board's decision, Bettucci argued that the Agency violated its own rules, regulations, and/or procedures governing the assignment process. ROP, Part I at 420. Specifically, Bettucci asserts that because in his view he had no performance problems while employed with the Board, his failure to obtain the assignments he sought could only be attributed to improper actions by the Agency.

In support of his assertions, Bettucci contends that he was not properly assigned to the overseas post he requested because his "corridor reputation" [7] was unfairly considered. Bettucci alleges that witnesses testified as to their awareness of his reputation and that his reputation was a consideration in the assignment process. Bettucci also states that the individuals involved in the assignment process had access to and awareness of his 1986 grievance and consideration of this material would have been equally improper. *See* ROP, Part I at 424–25 (Grievant's Post–Trial Brief of Aug. 14, 1989 at 53–54).

Furthermore, Bettucci alleges that the Assignment Board failed to properly consider the health of his family in making assignment determinations. Specifically, Bettucci states that the Assignment Board failed to assign him to a post of duty with adequate medical facilities. Finally, deficiencies in language training are also asserted by Bettucci. In this regard, Bettucci claimed that the Assignment Board ignored the option of assigning him to a post for which he was language qualified.

In its rejection of Bettucci's grievance on this issue, the Board concluded that although Bettucci cited several witnesses who testified that they were aware of his corridor reputation, he failed to point to any Assignment Board members that actually relied on this reputation in making assignment determinations. Moreover, the Board's opinion indicates that Bettucci's failure to obtain certain assignments was attributable to his performance problems, his arguments to the contrary notwithstanding. FSGB May 14, 1990 Op. at 8. The Board's opinion states "Grievant argues that he had no performance problems... But the record shows clearly that grievant did have performance problems, namely his difficulty in working with others, which impeded his assignments." *Id.* at 8–9. The Board also cited the credible testimony of Assignment Board members that indicated that they followed the appropriate precepts. *Id.* at 9.

The record amply supports the conclusion that the opinion of the Board is supported by substantial evidence. Bettucci states that the testimony of witnesses John Steele, John Speicher, Dan Sutton, Carole Jones, and Robert Halligan demonstrates that the Assignment Board acted improperly with respect to determining Bettucci's assignment. However, the testimony of these witnesses indicates otherwise. Not only is the record and testimony of these witnesses devoid of any suggestion that consideration of Bettucci's corridor reputation was a substantial factor in the assignment process, the record also fails to suggest that any improper consideration was undertaken by the Board including consideration of Bettucci's past grievances or the medical necessities of his family.

John Steele testified that during the relevant time period, he was the second level supervisor of Bettucci for a period of 14 months. Steele indicated that he was familiar with the work performed by Bettucci in his division and rated his performance as a rating officer. ROP, Part III, April 11 Trans. at 19–20. When asked as director of the Office of Management Support and supervisor of Bettucci if Bettucci could perform in an FS–1 position, Steele stated that "because of [Bettucci's] judgment, ... I questioned how well he could perform in an FS–1 position." *Id.* at 29. Steele was also questioned before the Board regarding Bettucci's capacity to handle a large overseas installation as executive officer. *Id.* at 35. Steele responded by testifying that the attitude problems exhibited by Bettucci made it difficult for him to respond to the type of problems that executive officers frequently encounter because in Steele's opinion, the proper attitude is a critical characteristic in that position. *Id.* at 36. Steele also stated that when he brought Bettucci's interest in obtaining certain positions to the attention to supervisors, "[t]heir responses were universally negative." ROP, Part III April 28, 1989 Trans. at 203.

With respect to Bettucci's corridor reputation, Steele testified that he was aware that

---

7. In this case, a "corridor reputation" refers to the reputation of an individual among his or her peers in an employment environment.

Bettucci did have such a reputation and that in fact all employees had such a reputation. *Id.* at 208 (stating that Bettucci's reputation was that he was difficult to work with and contentious). When asked if Bettucci's reputation impacted his decisions to assign Bettucci, Steele clearly stated "I can say with certainty that [discussions of assignments for Bettucci] were not affected by that reputation." *Id.* at 209. Steele explained that official reports that would be made available to an assignment board would be one of the causes of a corridor reputation. *Id.* at 216. In Steele's view, it would not be possible to sever a corridor reputation from the negative reports properly considered by the assignment board as the former is the product of the latter. Steele's testimony offers no evidence that the assignment board improperly relied on any corridor reputation that Bettucci may have developed. *See* Part III, April 11, 1989 Trans. at 28–64; ROP, Part III, April 28, 1989 Trans. at 196–221.

The testimony of John Speicher also confirms that Bettucci received negative evaluations during the course of his employment with the Agency that placed Bettucci in the lower 5–10% of all rated individuals. ROP, Part III, April 12, 1989 Trans. at 60. Speicher served as a Career Development Officer ("CDO") and counseled Bettucci when he received his poor evaluation. *Id.* at 67. Speicher confirmed deficiencies in Bettucci's interpersonal skills and stated that "if a person has a reputation for poor performance or a bad reputation or a professional reputation or a corridor reputation ... it will impact on how this person is viewed against other qualified candidates that are coming up for the same job at the same time." *Id.* at 74. Speicher equated a corridor reputation with a performance record and indicated that the two were essentially inseparable. *Id.* at 78.

As an assignment board member, Speicher recalled Bettucci's name coming before the Board but had no specific recollection of giving any consideration to his corridor reputation. *Id.* at 101. In fact, Speicher had no recollection of the actual consideration of Bettucci for an assignment when his name came before the Board. *Id.* Speicher also testified that he acted as an advocate for Bettucci before the Board but admitted that other candidates had superior qualifications for the positions for which Bettucci applied. *Id.* at 103. One of the final questions put to Speicher was whether he had any reason to believe that the assignment board violated its precepts with respect to Bettucci. *Id.* at 104. In response to this question, Speicher simply stated "no" and concluded that he believed that the Board identified a good assignment for Bettucci. *Id.*

Bettucci also asserts that the testimony Daniel Sutton supports his argument that the Agency violated rules, regulations, or procedures in assigning grievant between March 1985 and March 1988. Sutton was a voting member of the Assignment Board from March 1983 through December 1984 and acted in a supervisory role with respect to Bettucci thereafter. ROP, Part III, April 28, 1989 Trans. at 152. Sutton also signed off on an EER for Bettucci covering the period of June 1986 through December 1986. *Id.* Sutton testified regarding his efforts to improve Bettucci's negative reputation within the Agency. *Id.* at 157. Although Sutton suggested that greater detail in Bettucci's 1987 EER would have been helpful, he testified that he could recall no erroneous, incorrect, or falsely prejudicial information contained in this report chronicling Bettucci's shortcomings. *Id.* at 162.

Carole Jones, Employee Relations Specialist for foreign service personnel during April 1987, also testified during the proceedings before the Board. Bettucci contacted Jones during April 1987 because he was having difficulty obtaining an oversees assignment. ROP, Part III, April 26, 1989 Trans. at 17. Jones testified that it was her understanding that Bettucci was having difficulty in obtaining overseas assignments because of the nature of his reputation. *Id.* at 23. She also stated that members of the Career Development office discussed his corridor reputation and what could be done to improve this reputation. *Id.* at 131. However, Jones ultimately indicated that she had no personal, first-hand knowledge of this reputation and although Jones made certain recommendations pertaining to Bettucci's assignments,

there is no evidence that she had any role in actually assigning Bettucci. *Id.* at 39–40.

Finally, Bettucci alleges that the testimony of Robert Halligan reveals the impropriety of the actions taken by the Assignment Board. Halligan served as Director of Personnel from 1986 through 1988. ROP, Part III, April 26, 1989 Trans. at 158. His duties in this capacity included determining who would sit on the Performance Standard Board ("PSB"), convening the PSB, and taking the results of the PSB and sending letters to Agency employees who were recommended for selection out and to those who were not recommended for selection. *Id.* While not a member of the PSB, Halligan was responsible for reviewing the recommendations of the PSB and acting on these recommendations. *Id.* at 158–59.

Halligan testified that he reviewed the recommendation provided by the PSB regarding Bettucci recommending Bettucci for "retirement due to relative performance." *Id.* In following the recommendation of the Board, Halligan stated that he had no reason to question the judgment of the PSB. *Id.* at 164. Halligan also testified that he attempted to assist Bettucci in obtaining a suitable overseas assignment. *Id.* at 168. In fact, Halligan directed that Bettucci be assigned to the overseas post of Sri Lanka. The directing of the assignment was prompted by the fact that the Agency has an obligation to assign Foreign Service officers overseas and a consequence of the fact that Bettucci was not "sought after" for an overseas assignment.

Halligan also testified regarding the corridor reputation of Bettucci. Halligan stated that he was unaware of Bettucci's corridor reputation and would not have considered it in deciding whether the affirm the recommendation of the PSB. *Id.* at 180. The record also indicates that Halligan considered only the recommendation of the PSB. This recommendation included a review of Bettucci's entire file relative to other members of his class. *Id.* at 182. Halligan stated that he had no reason to believe that the PSB violated its Precepts with respect to Bettucci. *Id.*

In response to Bettucci's argument that prior grievances were improperly considered, Halligan concluded his testimony by stating that the Assignment Board would not have access to personnel files that would contain a grievance filed by any individual. *Id.* at 205. Therefore, any grievances filed by Bettucci would not be considered by the Assignment Board in their decisions to assign Bettucci. Similarly, the PSB would not have access to grievances filed by an employee. *Id.*

In sum, Bettucci points to the testimony of several witnesses as supporting the conclusion that the Agency violated rules, regulations, or procedures in assigning him between March 1985 and March 1988. However, an actual review of the testimony offered by these witnesses fails to suggest that the Agency acted improperly in any manner when assigning Bettucci. Although these witnesses testified as to the existence of Bettucci's negative corridor reputation, the testimony reveals that the reputation is simply mirrors Bettucci's evaluation reports. Bettucci's negative reports do not exist in a vacuum and it is natural for reviewing parties to draw conclusions regarding Bettucci's abilities and qualifications from these reports. There is no testimony or other evidence suggesting that Bettucci's reputation was a substantial factor in assigning him or that the reputation was relied on by the Assignment Board to an extent greater than any reputation that would be generated from simply reading his evaluation reports.

Bettucci's contentions that he could not obtain an overseas assignment for improper reasons, in particular due to the reliance on corridor reputation, is belied by the testimony of Halligan as discussed above. As stated, Halligan testified that he never considered reputation in Bettucci's case. Moreover, the review of the record as discussed above demonstrates that there is extensive evidence supporting the conclusion that Bettucci had performance problems and that the Agency made every effort to assist Bettucci in improving his performance and his reputation within the Agency. Bettucci's claims are unsubstantiated and a review of the entire record demonstrates that there is substantial evidence to support the Grievance Board's decision on this issue.

ii. *Whether Bettucci's Career Development and Training Assignments Violated Applicable Rules and Regulations*

██ Bettucci contends that the Agency deprived him of effective career development, training, and foreign language instruction. ROP, Part I at 437 (Grievant's Post-Trial Brief at 66). In the area of career development, Bettucci alleges that career counseling and interaction with a career development officer was unavailable to him prior to 1985. *Id.* After that date, Bettucci states that the contact was sporadic and was reactive rather than proactive. *Id.* Bettucci also argues that "circumstances indicate that the Agency, in an attempt to validate the erroneous comments in the 1995 EER grieved [by Bettucci], chose to make it appear that Grievant had a problem which required counseling." *Id.* at 437–38.

Deficiencies in significant training opportunities are also alleged by Bettucci. *Id.* at 439. This training deficiency is cited as the primary factor preventing Bettucci from competing for advancement in the Foreign Service. *Id.* at 439–40. Bettucci contends that the Agency denied him the requisite language training necessary for overseas duty and that his performance rating was consistently downgraded due to language deficiency. *Id.* at 441.

The Board characterized Bettucci's arguments in the following manner: "grievant is essentially arguing that his career did not prosper as he thought it should, or as well as those of some of his peers... In these generalized allegations, grievant fails to state specifically which training assignments were denied to him in contravention of specific regulations or laws." FSGB May 14, 1990 Op. at 12–13. The Board concluded that "[i]t is not enough to list, as he does, the regulations pertaining to training and then to provide a narrative account that implies somehow that these regulations were breached." *Id.* The Board ultimately determined that Bettucci failed to demonstrate evidence that his career was adversely affected because the agency denied him training or failed to provide him with the necessary career development counseling. Review of the entire record reveals that the conclusions reached by the Board are supported by substantial evidence.

Bettucci's first contention pertains to the alleged insufficiency of career counseling he received while employed by the Agency. The previously detailed testimony of Carole Jones and Daniel Sutton document the counseling efforts undertaken by the Agency with respect to Bettucci. Sutton testified that Bettucci contacted him to disclose that he had agreed to involve himself in career counseling. ROP, Part III, April 28, 1989 Trans. at 146. Sutton stated that when contacted by the Director of Personnel he indicated that counseling would be a useful process for Bettucci and took the necessary steps to insure that counseling would be made available to Bettucci. *Id.* Sutton described the opportunity of counseling made available to Bettucci as a "good opportunity for [Bettucci] to talk with somebody who was non-threatening and who could give him the kind of guidance that might help him understand why the problem had occurred in Haiti [the assignment prompting Bettucci's previous grievance]." *Id.* at 150. Sutton also testified regarding his own efforts to counsel Bettucci in hopes of improving Bettucci's reputation within the Agency. *Id.* at 157.

The testimony of Carole Jones, an employee with the Agency in the Administrative/Personnel office, further demonstrates the Agency's efforts to provide counseling for Bettucci. As an Employee Relations Specialist during the relevant time period, Jones testified that she met with Bettucci approximately six times to discuss the unsuccessful efforts of Bettucci's Career Development Officer, Lovie Davis, in assisting Bettucci in resolving the problem of finding a suitable assignment. ROP, Part III, April 26, 1989 Trans. at 19. Jones also stated that the terms of Bettucci's prior grievance settlement required him to attend career counseling. *Id.* at 20. Jones documented the discussions of the Career Development staff pertaining to the problems experienced by Bettucci and her suggestion that Bettucci meet with John Speicer, a Career Development Counselor. *Id.* at 32–33. Jones' counseling sessions with Bettucci were not termi-

nated until she and Bettucci agreed that they had achieved the objective of determining the cause of the problems experienced by Bettucci.

The extent of counseling extended to Bettucci was also confirmed by the testimony of John Speicher. Speicher was employed as a Career Development Officer and he testified that he met with Bettucci on numerous occasions to discuss strategies for improving Bettucci's reputation and his efforts to obtain overseas assignments. ROP, Part III, April 12, 1989 Trans. at 54. These contacts initiated with the negative EER Bettucci received after his assignment in Haiti. Speicher continued to counsel Bettucci until the summer of 1987 in an effort to improve Bettucci's interpersonal skills. *Id.* at 63.

Bettucci also contends that he was provided with inadequate training throughout his tenure with the Agency and his lack of training was detrimental to career advancement within the Agency. During the time Bettucci was employed with the Agency, John Jessup served as the Branch Chief of Training Division's branch for administrative and special training programs. ROP, Part III, May 15, 1989 Trans. at 70. In this role, Jessup testified that he possessed a thorough familiarity with AID regulations concerning training and was responsible for approving the training applications within the branch's particular area of responsibility. *Id.* at 71.

During the course of the hearing before the Board, Jessup examined the Employee Data Record ("EDR") for Bettucci. Jessup indicated that when an employee completes a training course for which his particular branch was responsible, the completion is entered into the data base and reflected on the EDR. *Id.* at 72. After reviewing Bettucci's EER, Jessup concluded that Bettucci received sufficient core training in comparison to other similarly situated employees. *Id.* at 73.

Jessup also offered testimony pertaining to his involvement in the Administrative Management Executive Development ("AMED") program. Bettucci claimed that the training courses that he participated in as a substitute for participation in the AMED program failed to provide the assignment and pro-

motional opportunities open to AMED program participants. Jessup stated acceptance into the AMED program was highly competitive and that participation in the AMED program was not a prerequisite to becoming a management or an executive officer within AID. *Id.* at 78. Jessup reviewed the requirements for the AMED program and the training that Bettucci received and testified that the core requirements of the AMED program were met by the training Bettucci received. *Id.* at 121.

Bettucci's final argument rests on the claim that he received inadequate language training. There is nothing in the record demonstrating the validity of this claim. The FSGB concluded that Bettucci was denied language training as a result of legitimate management reasons. In both situations, the language requirements and language training were waived in Bettucci's case due to the immediate need for a Foreign Service Officer at the post at issue. *See, e.g.,* ROP, Part IV at 377 (Telegram to American Embassy in Bujurumba regarding Bettucci's request for language training). Bettucci has failed to present any evidence suggesting this conclusion was erroneous.

In light of the relevant testimony elicited at the hearings before the Board, the Board's conclusion that Bettucci failed to demonstrate that he was improperly denied training by the Agency to the detriment of his career prospects is supported by substantial evidence. Moreover, the conclusion that Bettucci failed to demonstrate that he was denied career counseling to such an extent that his career was adversely affected is likewise supported by such evidence.

iii. *Whether EER's relied on by the Agency Were Inaccurate, Erroneous, Falsely Prejudicial or Contrary to Agency Rules and Regulations*

 Bettucci argues in the post-trial brief submitted to the Board that his EERs that he received during certain time periods were inaccurate, falsely prejudicial, or contrary to Agency rules and regulations. These EERs included those submitted for the periods of March 8, 1983 to May 31, 1984

in Burundi, June 1 to December 21, 1986 in the Overseas Management Division, and for January 3 to May 31, 1987 in the Overseas Management Division. The FSGB considered each EER and the issues arising thereunder separately. For the sake of consistency, a similar examination will be undertaken by this court to determine whether the Board's conclusions are supported by substantial evidence.

### EER for March 8, 1983 to May 31, 1984

Bettucci asserts that the EER for his performance as management officer of the AID mission in Burundi contained falsely prejudicial information. During his assignment in Burundi, his rating officer was George Bliss, the AID representative heading the mission. According to the Board, Bettucci received an EER from Bliss for a period of fewer than five months and then again after his family had been medically evacuated from Burundi and Bettucci requested and was granted a mid-tour reassignment. Bettucci challenged the bias of Bliss as a rater and Bliss' ratings of Bettucci's major procurement follow-up, his role in the development of a GSO filed support unit, and Bettucci's confrontational behavior and his intellectual skills. Bettucci also asserts that the procedures followed in preparing his 1984 EER were in violation of AID's General Notice on the Preparation of EERs. Each of these issues were considered separately by the Board.

### Bettucci's Claim that Rater's Bias Caused an Inconsistent EER

Bettucci claims that George Bliss adopted a change in attitude after he was notified of Bettucci's intent to transfer out of the Burundi post and upon learning that he refused to extend his stay beyond one extra month. Bettucci contends that Bliss' bias was evidenced by his refusal to permit Bettucci to attend staff meetings, a discontinuation of social interaction, and a failure to abide by the technical requirements of the EERs. Bettucci's claim of improper bias is "corroborated" in his view by a comparison of the favorable EER of 1983 and the unfavorable EER of 1984. Beyond his own testimony, Bettucci provides no evidence of bias or other improper action by Bliss with respect to the 1984 EER.

### Bettucci's Claims of Substantive Error in the 1984 EER

The remainder of the arguments set forth by Bettucci challenge the substantive conclusions reached in the 1984 EER submitted by Bliss. As will be demonstrated, the record amply supports the Board's decision that the no error existed in the 1984 EER. The evidence relating to this issue also belies any claim by Bettucci that the discrepancy between the 1984 and the 1983 EERs was caused by any bias exhibited by Bliss.

Initially, Bettucci challenges Bliss' statement that there had been occasional lapses on his part in the timely follow-up on major procurement. Bettucci contends that his role with AID did not include procurement and therefore, it was unfair to incorporate negative comments regarding duties and responsibilities beyond the scope of his employment in an EER. Opp. to Mot. to Affirm at 122. Bettucci asserts that he took on the added duty of procurement because of the inefficiency of the Embassy at which he was stationed and that he performed procurement duties in an extremely conscientious manner. Moreover, Bettucci seeks to blame the distributor of the procured items, Sears, for any shortcomings in this area.

Bliss testified the mission's furniture and equipment situation was largely inadequate when Bettucci arrived in Burundi and that Bettucci arranged a large order for household and office equipment to rectify this situation. ROP, Part III, April 28, 1989 Trans. at 33. However, Bettucci sent the procurement request to the wrong address and the items failed to arrive at the post until after Bettucci had left that particular mission. *Id.* at 33. Bliss also stated that although Bettucci did follow up on this procurement when he returned to the United States, there were times that Bettucci had to be reminded about this error. The Board concluded that substantial problems existed with respect to this procurement and this conclusion is supported by substantial evidence.

Bettucci also disputes the statements indicating that he failed to take the initiative to create a GSO field support unit which had

been recommended, approved, and funded. Bettucci contends that the record reflects that he took positive and effective action to create the unit. Opp. to Mot. to Affirm at 127. Bettucci claims that he recommended the creation of the unit, drafted the justifications for the unit, wrote position descriptions for each member of the unit, hired certain individuals associated with the development of the unit, and took documented action to fund the unit.

The Board concluded that although Bettucci took some preliminary steps to create the unit, the evidence demonstrated that he did not pursue the actions necessary to establish the unit in a timely manner during the rating period. FSGB May 14, 1990 Op. at 33. This conclusion is supported by the testimony of Bliss. Bliss testified that Bettucci largely failed to complete the task of establishing the support unit during his tenure despite Bliss' belief that Bettucci should have been able to achieve this goal. ROP, Part III, April 11, 1989 Trans. at 135–36; ROP, Part III, April 28, 1989 Trans. at 35–36. Indeed, Bliss stated that there had been very little movement with respect to the creation of the support unit. ROP, Part III, April 28, 1989 Trans. at 35–36. Bettucci has made no showing to refute the testimony of Bliss or a showing that the report was falsely prejudicial. *See also* ROP, Part III, April 11, 1989 Trans. at 135–36 at 144–45 (testimony by Bliss detailing other shortcomings exhibited by Bettucci).

Bettucci questions the validity of statements found in the EER pertaining to his confrontational attitude. Bliss described Bettucci as creating confrontational situations in which Bliss would have to interject and "referee." Bettucci contests the credibility of Bliss as a rater in light of the 1983 EER and other statements in the 1984 EER detailing his positive interaction with the Embassy.

Bettucci's argument is undercut by the inconsistency of the conclusion he sought the Board to draw. In one breath, Bettucci argues that the unfavorable conclusions contained in the EER must be disregarded because of Bliss' lack of credibility. In the other, Bettucci seeks to demonstrate Bliss'

alleged lack of credibility by pointing to favorable statements written by Bliss in the very same opinion. Before the Board, Bliss documented instances where Bettucci adopted a confrontational attitude and Bettucci even communicated to Bliss that "he appeared to be a confrontational person." ROP, Part III, April 28, 1989 at 39. The opinion by the Board included several other examples taken from the record chronicling Bettucci's confrontational nature. FSGB May, 14, 1989 Op. at 26. In light of all the evidence taken from the record, the Board's rejection of Bettucci's argument is supported by substantial evidence.

Bettucci also alleges that Bliss erred in evaluating his intellectual skills. As summarized by the Board, Bettucci asserts that Bliss did not comply with EER instructions to note the extent to which the intellectual skills were required on the job and to support the assessments with examples of what and how work was performed. FSGB May 14, 1989 Op. at 27. Bettucci argued that he was unable to respond to the criticisms set forth by Bliss because of the lack of specific examples to support the assessment. Opp. to Mot. to Affirm at 140. Again, Bettucci seeks to refute the negative aspects of the assessment addressing his intellectual skills with other statements in the EER praising his skill, experience, initiative, and accomplishments. *Id.* at 141.

The Board disagreed with Bettucci's contention that this section of the EER was flawed because the rater criticized his performance without giving specific examples. FSGB May 14, 1989 Op. at 28. The Board concluded that Bliss' statements were consistent with the instructions under the applicable section of the EER which requires an assessment of how the work was performed. The Board found nothing falsely prejudicial in Bliss, comments in this section and dismissed his allegations as without substance. *Id.* at 29.

Review of the record indicates that the Board's conclusions concerning the statements in the EER detailing Bettucci's intellectual skills are supported by substantial evidence. Bettucci's EER stated "an overconfidence in these skills in the em-

ployee's reaction to problems leading to precipitate judgments and sometimes inadequate drafting of written communications." ROP, Part III, April 28, 1989 Trans. at 40. Bliss explained that although Bettucci had tremendous skill in some areas, Bettucci demonstrated deficiencies in certain written communications. Specifically, Bettucci inadequately drafted a multi-faceted justification for the purchase of a home which Bliss was forced to rewrite due to the unacceptable nature of Bettucci's submission. *Id.* at 41. In light of this testimony, Bliss adequately substantiated the claims of certain deficiencies in Bettucci's intellectual skills. There is also no evidence in the record that Bliss failed to comply with the instructions of this section of the EER. Accordingly, Bettucci's argument that this section of the Board's argument is in error is without merit.

Bettucci's final contention with respect to the 1984 EER is that the procedures followed in preparing the EER were in violation of the Agency's General Notice on the Preparation of EERs. Opp. to Mot. to Affirm at 147. Bettucci argues that he was entitled to but did not receive either prior notice and an opportunity to discuss the criticisms which are mentioned in the EER or ten working days to review the draft EER. Bettucci also asserts that he was not provided with an opportunity to negotiate for correction and revision of the EER or permitted to have a review of the EER by a reviewing officer and/or a unit review panel. Opp. to Mot. to Affirm at 149.

In rejecting Bettucci's arguments, the Board initially stated that the AID General Notice of May 25, 1983 on the Foreign Service Employee Evaluation and Rating Program requires that performance shortcomings should be discussed with the rated officer during the rating period. FSGB May 14, 1989 Op. at 31. The Board also noted that the Notice specifies that a draft EER should be discussed with the employee before a final report is issued and encourages rating officers to complete draft reports so that the rated employee has ten work days to review the EER and discuss it with the rating officer.

The Board concluded that Bettucci failed to show that the rating officer deliberately failed to allow him proper time in which to review and discuss his EER. According to the Board, the record reveals that on June 1, 1984, Bliss requested that the American employees submit by June 6 a list of their accomplishments and updated work requirements for the rating period ending on May 31. Bettucci submitted his response on June 4 and received the first draft of the EER the next day. Bettucci and Bliss discussed the draft and on June 7, Bettucci received a second draft of the EER. After further discussion, the final EER was prepared and delivered to Bettucci on June 8.

The Board found that Bettucci had arranged for his mid-tour transfer and that his departure could have been delayed for additional time to review the EER if Bettucci determined that such time was necessary. In contrast, Bettucci states that his departure was necessitated by the ill health of family members. In either event, it appears that compliance with the time limits included in the Notice in this case was impossible. However, it does appear that the parties made every effort to comply with the spirit of the Notice requirements—discussion and deliberation between the parties regarding the EER. Therefore, it is this court's opinion that the conclusion of the Board as to whether the requirements of the Notice were satisfied is supported by substantial evidence.

The Board also concluded that the absence of a reviewing officer to review the EER did not contravene the applicable regulations. In assignment locations where there is no appropriate official capable of reviewing the EER, the box where the reviewer's name should appear includes the statement "no appropriate reviewing officer." FSGB May 14, 1989 Op. at 33; ROP Part IV at 16. The regulations contemplate that the designation of a reviewing officer rests with the principal officers at posts abroad and where there is no officer senior to the rating officer with sufficient knowledge of the employee's performance to carry out the review function, this must be specified. In the instant case, no senior officer was stationed at the post

and this was indicated on the EER. ROP, Part IV at 16.

Bettucci's arguments that a review panel should have been established are equally without merit. Regulations require that a review panel must only be established to ensure that EERs have been properly prepared if a mission has more than ten employees. The Burundi mission of which Bettucci was a member had only seven employees. *Id.* Accordingly, the Board properly found that the Agency complied with the requirements with respect to the issuance of Bettucci's EER.

*EER for June 1, 1986 through December 31, 1986*

Bettucci also asserts that the EER for the period of June 1, 1986 through December 31, 1986 was inaccurate, neither fair nor impartial, and not in compliance with the various technical and procedural requirements governing the issuance of EERs. During this time period, Bettucci served as regional executive officer for East and South African countries. The Board's opinion indicates that the evaluation is an interim EER occasioned by the retirement on December 31, 1986 of Bettucci's supervisor and rating officer, Joseph Tucker.

Bettucci provided Tucker with a list of his accomplishments for inclusion in the EER. Although the EER gave Bettucci an overall rating of superior, he claims that the EER was falsely prejudicial because it failed to focus on several of his accomplishments. Bettucci argues that the EER neglected to mention his continuing responsibility of "section 636c purchases" and lacked specificity regarding his supervisory responsibilities carried out while substituting for executive officers on temporary duty. Opp. to Mot. to Affirm at 155–58. Bettucci also documents alleged shortcomings in the reporting of his accomplishments pertaining to security coordination and mission compliance with security procedures and reasserts the same perceived procedural and technical violations in the drafting of his EER as stated with respect to his 1984 EER. *Id.* at 158–63. Bettucci claims that the violations disadvantaged him because a review panel would have required the rater to correct the alleged deficiencies and the resulting EER would have precluded the 1987 STB from low ranking him.

Testimony solicited from Tucker directly refutes Bettucci's argument that procedural or technical violations occurred in the drafting of the 1986 EER. As the Board stated and the record confirms, Tucker testified that he used Bettucci's list of accomplishments in preparing the EER. Furthermore, Tucker testified that although he rated Bettucci as superior he did so in order preserve Bettucci's position within the Agency relative to other employees. Tucker stated:

> Well, when preparing the document and having been with the Agency as long as I have been and [knowing] the way the system worked, in order to prepare an evaluation in the Agency without affecting the employee . . . you more or less had to rate them superior at least in order to keep them within the running of everybody else and their coworkers and companions.

ROP, Part III, April 28, 1989 Trans. at 91.

In rating Bettucci, Tucker compared his work performance with what was required of an individual occupying a level FS–01 position. *Id.* at 92. He further added that he relied on Bettucci's own assessment of his performance in rating the temporary duty assignment in Zimbabwe. *Id.* at 100. Moreover, Tucker testified that the information submitted by Bettucci pursuant to Tucker's requests was so voluminous that Tucker was forced to synthesize the information provided by Bettucci along with his own observations and combine the two in order to prepare the EER within the framework of the Agency guidelines, *id.* at 104, and added that all EERs were composed in this manner. *Id.* at 107.

In elaborating on the drafting of Bettucci's EER, Tucker testified that he prepared drafts on all evaluations and had them reviewed by Bettucci prior to the EER being put in final form. *Id.* at 108. Tucker also indicated that he had Bettucci's concurrence in the evaluation prior to the issuance of the EER. *Id.* at 111. Tucker concluded his assessment of Bettucci's EER by stating that the information in Bettucci's EER was factu-

al and legitimate and that it contained no erroneous information. *Id.* at 113. Moreover, he reviewed and discussed this document on numerous occasions with Bettucci. *See also* ROP Part IV at 27–33 (Bettucci's December 31, 1986 EER).

In light of Tucker's testimony before the Board, the Board concluded that Bettucci's suggestion that further review by a review panel or that an altered EER would have precluded his low ranking before the STB should be dismissed as speculation unsupported by any evidence. This court concurs that Tucker's testimony substantially supports this conclusion and Bettucci has failed to direct this court to any evidence suggesting that a contrary conclusion should be reached.

*Conclusion*

Bettucci has failed to demonstrate that the EERs relied on by the Agency were inaccurate, erroneous, falsely prejudicial, or contrary to the applicable rules and regulations. Bettucci also did not challenge the decision reached by the Board on the EER submitted for the January 3, 1987 through May 31, 1987 time period. The conclusions reached by the Board and its interpretations of the relevant Agency rules, guidelines, and other requirements are supported by substantial evidence in the record. Bettucci offers only speculation and surmise to dispute the conclusions of the Board on these issues.

 iv. *Whether the 1987 Senior Threshold Board Violated Applicable Precepts, Rules, Regulations, and Policies in Low–Ranking Bettucci and Referring Him to Performance Standards Board*

In its opinion, the Board discussed the narrow grounds upon which the issue of whether the 1987 STB violated applicable Precepts in low ranking Bettucci and referring him to the 1987 PSB would be reviewed. The Board communicated to the parties that under section 1101(b)(2) of the Foreign Services Act, the judgment of STB and PSB members is not a grievable matter. However, the Board requested that the Agency agree to make members of these Boards available for questioning on possible proce-dural violations of the STB or the PSB. The Agency agreed to this request. Three members of the 1987 STB that low-ranked Bettucci and three members of the 1987 PSB that recommended that he be mandatorily retired on the basis of relative performance appeared before the Board to submit to questioning by Bettucci. Under an arrangement approved by the Board, members of these two Boards were questioned by Bettucci in the presence of panel members and a court reporter on April 10, 1989, the day immediately preceding the scheduled start of the formal hearing on Bettucci's proposed separation.

Bettucci contends that the Selection Board members improperly reviewed his entire Official Personnel File during deliberation and that review of this file is not permissible under the applicable Agency regulations. Bettucci claims to have submitted an abundance of evidence showing that the Agency illegally and in a manner contrary to law placed numerous grievance documents in his personnel file dating back to his 1974 grievance. Opp. to Mot. to Affirm at 167. According to Bettucci, a review of his personnel file by the Selection Boards prejudiced his chance for a fair evaluation review. *Id.* at 168.

Bettucci claims that because of his superior ranking during the last five years of his career with the Foreign Service, the logical inference is that there remains only four possible reasons for his low ranking by the STB. These reasons include: (1) the STB gave undue weight to the 1984 EER which Bettucci claims he has shown to be inaccurate, erroneous and falsely prejudicial or the allegedly vague and misleading 1986 EER; (2) the Board gave undue weight to the undocumented 1985 grievance period of service and other grievance periods as represented by gaps in evaluations and files due to grievance related expungement; (3) the Board knew and considered information outside of that information on which they were allowed to base their evaluation including corridor reputation and grievances; or (4) the superior ratings have no meaning in the process. Opp. to Mot. to Affirm at 169.

Bettucci asserts that if the reason for his low ranking is among the first three possibilities, then the Selection Board action is necessarily fatally flawed. In contrast, if the real reason is the fourth reason, then Bettucci contends that the entire EER system is fatally flawed. Bettucci expresses disbelief that an employee rated as "superior" could be found to have failed to have met the standards of the class.

The Board concluded that a review of the testimony of the members of the STB failed to reveal any breach in the observance of the precepts during the panel's deliberations. FSGB May 14, 1990 Op. at 48. The Board also found that Bettucci's suggestion of the possible improper reasons why the STB may have low-ranked him in 1987 amounted to conjecture without any substantiation. The Board stated "[w]e find that grievant's speculation on how the board's deliberations may have been procedurally flawed simply cannot be given any weight after the Board, with the Agency's cooperation, had arranged for grievant to have direct access to the selection board members for questioning on any possible violations of the precepts." Id. at 49. The Board further added that Bettucci's conjecture in his final brief on why the STB may have decided to low-rank him was without evidential support and thus, without merit.

■■■ In response to Bettucci's argument that the entire STB rating process was fundamentally flawed, the Board determined that Bettucci failed to show that the system was contrary to statute or regulation nor had he indicated how he was treated differently than other employees that had been rated by the STB. This conclusion was supported by the fact that six of the eleven employees referred to the PSB by the 1987 Senior Special A Selection Board had superior ratings and 97 percent of the Agency's Foreign Service employees were rated superior to outstanding in 1987.

The transcript of the April 10, 1989 hearing before the Board confirms that the conclusions of the FSGB are supported by substantial evidence. Janet Ballantyne was the first member of the 1987 STB examined by Bettucci. She participated as the Chairman of the Threshold Panel assigned to evaluate employees with last names between the letters of A and K. The panel reviewed approximately 270 files of all occupational categories. Ballantyne testified that she was thoroughly briefed on the Precepts of the Board to insure that each panel member understood what the Precepts required. ROP, Part III, April 10, 1989 Trans. at 11.

When questioned specifically about the rating of Bettucci, Ballantyne stated that she could not specifically recall evaluating his file. Id. at 13. Ballantyne testified that the Board considered EERs, all evaluation reports, and any other relevant documentation that is in the personnel file. During cross-examination, Ballantyne corrected her reference to the STB's consideration of the personnel file. She stated that the STB only considered the official evaluation file and that her reference to the personnel file was a mislabeling of the file considered by the STB. Id. at 29.

After the testimony of Ballantyne, Ersa Poston was questioned regarding her involvement on the STB that low rated Bettucci. Poston indicated that in her capacity as an STB member, she was given the personnel files of the candidates to review which contained personnel histories and profiles of the employees. She offered no further testimony. Id. at 37.

David Lundberg was the last member of the 1987 STB questioned. Lundberg testified that the STB was provided with the performance file of the individuals to be reviewed. He stated that the files contained a history of employment such as letters of commendation and other personnel actions that had occurred. Id. at 43. Lundberg did not offer any testimony suggesting that the STB made any improper considerations with respect to Bettucci's file.

The Board also relied on the testimony of Wilma Ditter in reaching the conclusion that Bettucci failed to demonstrate that the STB's actions were contrary to statute or regulation. As Deputy Chief of the Evaluation Branch, Ditter detailed the procedures followed by STB members in evaluating employees. ROP, Part III, May 15, 1989 Trans. at 180–81. She testified that she was respon-

sible for providing evaluation files to the STB and that these files comprised only the employee's evaluation file. *Id.* at 189. These evaluation files contained only the completion of assignment records (COARs), the employee's backstop grades, training records, previous positions, letters of commendation, and EERs. Ditter stated that neither the STB nor the PSB had access to the official personnel folders of the employees to be rated.

Ditter also addressed Bettucci's concerns that his file was incomplete when ultimately reviewed by the STB. Ditter admitted that the EER prepared by Tucker on December 31, 1986 was originally missing from Bettucci's file. *Id.* at 213. However, Ditter explained that the EER was eventually located and forwarded to and considered by the STB.

Questions were also posed to Ditter as to whether her office retained statistics on what ratings were given to various Foreign Service employees. Ditter stated that she maintained an informal listing of the percentage of employees rated within each category. *Id.* at 219. She commented that this informal listing was maintained because it was not uncommon for employees to question being low-ranked after having received "outstanding" or "superior" evaluations. Ditter further explained that some employees would be referred to the PSB despite such rankings simply because the bottom five percent of all ranked employees within the given class would be referred regardless of the rankings they received. *Id.* Indeed, when Bettucci was low-ranked by the STB, six employees were also rated superior but still referred to the PSB.

Ditter concluded her direct testimony by stating that she had no reason to believe that the STB violated its own precepts with regard to Bettucci. *Id.* at 230. After a review of the record, it is this court's conclusion that Ditter's assessment of the 1987 STB is correct and that the Board's determination that the STB did not violate any of its Precepts with respect to Bettucci is supported by substantial evidence. The testimony of the members of the STB clearly demonstrates that Bettucci's assertions are simply unfounded.

v. Whether the 1987 PSB Violated Applicable Precepts, Rules, Regulations or Policies in Recommending that Bettucci Be Mandatorily Retired

As indicated by the Board and borne out by an examination of Bettucci's opposition to the motion to affirm the decision of the FSGB, Bettucci predominantly raises largely the same arguments with respect to the 1987 PSB as he presented with respect to the 1987 STB. Bettucci claims that the 1987 PSB placed undue reliance on the 1984 EER which contained negative references to Bettucci. Opp. to Mot. to Affirm at 174. Bettucci also asserts that if the PSB compared his 1984 EER with his 1993 EER, it would have been apparent that the negative comments contained in the 1984 EER were caused by bias. *Id.* at 175.

Bettucci contends that the PSB also considered improper information including prior grievances and his corridor reputation. *Id.* at 186. In support of this argument, Bettucci states that he was disadvantaged by his corridor reputation, by falsely prejudicial EERs, by the lack of assignments, career development and training, and by the numerous violations of procedure previously alleged. *Id* . at 187. Moreover, Bettucci asserts that the 1987 PSB considered the fact that he had been low ranked by the 1985 selection board and that his evaluation file had been referred to the 1985 PSB. According to Bettucci, this constituted a violation of the settlement agreement entered into with the Agency on September 29, 1986. The terms of the agreement required the Agency to expunge all references to the low ranking Bettucci received in 1985 as a result of Bettucci's successful grievance.

Three members of the 1987 PSB appeared at the Board's hearing on April 10, 1989 to answer questions posed by Bettucci and his counsel concerning possible procedural violations of the precepts by PSB members in considering whether to recommend that Bettucci be mandatorily retired on the basis of relative performance. FSGB May 14, 1990 Op. at 52. After considering the testimony of the individuals who appeared on behalf of the PSB, the Board concluded that there was no evidence to contradict the conclusion that

the PSB in making its recommendation did so only after conducting a comprehensive review of Bettucci's file. *Id.* Moreover, the Board stated that the evidence failed to show either that the PSB violated its Precepts by focusing only on the most recent and most negative EER or that the Board failed to establish the appropriate standards by which to judge Bettucci.

The testimony of the three members of the PSB demonstrates that the Board's conclusions with respect to the issues of whether the PSB violated its Precepts, gave undue consideration to any given EER, or failed to establish appropriate review standards is supported by substantial evidence. David Bathrick was the first member of the 1987 PSB to testify before the Board. Bathrick stated that the PSB members were provided with an orientation and reading materials in preparation for reviewing the employee files presented to the PSB. ROP, Part III, April 10, 1989 Trans. at 53–54. Bathrick's testimony is devoid of any suggestion that the PSB improperly focused on any given EER or failed to establish appropriate standards against which to judge an employee referred to the PSB. *See generally id.* at 51–61.

Robert Queener also submitted to questioning before Bettucci as a member of the 1987 PSB. During the hearing, Queener stated that the members of the PSB were given a copy of the Precepts, Foreign Service Act and were "walked through the Precepts by an officer of the Foreign Service personnel . . . so it was clear [the PSB members] had read the Precepts and understood each part of it." *Id.* at 73. Queener testified that the first task of the PSB was to establish standards for performance for AID officers within each occupational specialty. *Id.* According to Queener, once the appropriate standards were in place, the PSB reviewed the employee's file which contained their EERs. *Id.* at 73–74. The testimony offered by Queener is devoid of any suggestion that the PSB neglected to establish the appropriate standards in Bettucci's case, that undue consideration was given to any particular EER, or that the Precepts of the PSB were violated in any manner. *See generally id.* at 70–75.

Harold Collamer was the third and final member of the PSB to appear before the Board on the April 10, 1989 hearing. Collamer testified that the members of the PSB were given a set of Precepts that were to govern the deliberations of the Board. *Id.* at 79–80. Collamer also stated that the PSB established standards and reviewed all EERs within the relevant time period. *Id.* at 81–83. The testimony of Collamer is similarly devoid of any suggestion that the PSB violated its Precepts, established inappropriate standards, or gave undue consideration to any given EER. *See generally id.* at 76–88. In light of the testimony of these three PSB members and the absence of any evidence to the contrary, it cannot be disputed that the Board's conclusions that the 1987 PSB did not violate its Precepts, that the PSB established appropriate standards against which to evaluate employees, and undue weight was not given to any of Bettucci's EERs are supported by substantial evidence. *See also* ROP, Part III, May 15, 1989 Trans. at 179–290 (testimony of Wilma Ditter).

The Board also addressed Bettucci's argument that his need to improve his interpersonal skills was never disclosed to him and that he consistently received high marks in this area in his EER. The Board relied on the testimony of Ambassador James Bullington, Carole Jones, and Daniel F. Sutton as documenting the numerous difficulties experienced by Bettucci with respect to his interpersonal skills. Furthermore, the testimony offered by these individuals supported the conclusion that Bettucci sought out and was offered counseling for the difficulties that he experienced. Ultimately, the Board found that "mention of [Bettucci's] interpersonal shortcomings by the PSB when it recommended his separation for relative performance is consistent with the record before [the Board]." Op. at 57.

Bettucci's interpersonal shortcomings are amply demonstrated by the testimony of Ambassador James Bullington. Bullington served as Ambassador to Burundi during the time in which Bettucci was stationed at that post. Bullington testified that he observed the working relationships between embassy personnel and Bettucci on several occasions.

ROP, Part III, April 12, 1989 Trans. at 109. Bullington also stated that members of his staff described Bettucci as "difficult to work with," "unreasonable," "stubborn," and "hard to get along with." *Id.* at 110.

The testimony of Carole Jones and Daniel Sutton was relied upon by the Board to refute Bettucci's claims that he had been denied career development counseling to address his interpersonal skill deficiencies. The testimony of both Sutton and Jones has been previously discussed by this court, *see infra* pp. 60, 61–62, and provides substantial support for the Board's conclusion that Bettucci was provided with counseling and that the mention of his shortcomings with respect to his interpersonal skills by the PSB when it recommended his separation for relative performance was consistent with the information before the Board.

Bettucci's contention that an unnamed PSB member reviewed his entire official personnel file was also considered and rejected by the Board. In its opinion, the Board stated that there was no evidence that either his administrative file or his grievance file from the Office of Labor Management Relations was considered by any PSB members. The Board explained "[t]his kind of vague claim cannot be given any substantial weight in view of the fact that when questioned by [Bettucci] on the procedures they followed, members of the PSB confirmed under oath that they had followed the precepts which permit boards to review only the evaluation file." FSGB May 14, 1990 Op. at 58. The Board reached a similar conclusion when it examined Bettucci's claims that the PSB considered prohibited materials in their deliberations including his corridor reputation. *Id.* at 59. The record, including the testimony of Bathrick, Queener, and Collamer, is simply devoid of any evidence supporting the arguments presented by Bettucci.

Finally, the Board considered Bettucci's assertion that the 1987 PSB improperly considered that he had been low ranked by the 1985 selection board in contravention of the 1986 settlement agreement. This agreement, by its terms, required the expungement of all references to that low ranking. The Board determined that the record failed to indicated that the 1987 PSB considered or was even aware of the low ranking. In sum, the Board specified that Bettucci failed to meet his burden of establishing that an Agency procedural error was a substantial factor in the decision to mandatorily retire him. FSGB May 14, 1990 Op. at 60.

The Board concluded that "[Bettucci] has not shown by the evidence, including the testimony of the PSB members he was permitted to question just prior to the hearing or by interrogatories, that the 1987 PSB was aware of the previous low ranking." *Id.* This court's review of the record and the testimony of the three PSB members fails to show any evidence that would suggest that any of the PSB members were aware of or considered the low ranking. Moreover, if such consideration did occur, there is simply no evidence that this consideration would have been a substantial factor in the PSB's decision. Accordingly, this court is compelled to conclude that the Board's conclusions on these issues are supported by substantial evidence.

vi. Whether Improper Matters, Including but Not Limited to Bettucci's "Corridor Reputation," Were Factors in or Considered in the Proceedings to Mandatorily Retire Bettucci

■ The penultimate argument presented by Bettucci is based on his assertion that a number of EERs were absent from his evaluation file when considered by the reviewing Boards. For this reason, Bettucci contends that the file did not present a full and accurate reflection of his accomplishments, assignments, evaluations, training, and demonstrated potential. Opp. to Mot. to Affirm at 187. The Board concluded that the three year statute of limitations with respect to the missing items had expired with respect to all but a few of the alleged missing documents and this court has found no reason to disturb this conclusion.

The allegedly missing documents falling within the three year limit include memoranda of performance ("MOP") and two Completion of Assignment Reports ("COAR"). Wilma Ditter testified as an official custodian of the employee evaluation files and Deputy

Chief of the Evaluation Branch of Foreign Service Personnel AID. ROP, Part III, April 12, 1989 Trans. at 122; ROP, Part III, May 15, 1989 Trans. at 171. She stated that she met with Bettucci after he raised concerns that certain documents were missing from his evaluation file. The missing MOP concerned an evaluation Bettucci received with respect to his time in Mbabane. ROP, Part III, May 15, 1989 Trans. at 196. Ditter testified that because of the nature of the MOP from Mbabane, it would not typically be included in an employee's evaluation folder because it was marked "eyes only." *Id.* at 199. Ditter explained that this type of document would normally be used as a tool to create the EER and Agency policy did not require inclusion of such a document in an employee EER. However, despite this policy, the MOP from Mbabane was included in Bettucci's file and considered by the selection board. *Id.* at 205.

Ditter also testified that COARs are not required to be included in evaluations files because the COAR is not an actual evaluation of performance. *Id.* at 278. Indeed, Ditter further added that it is uncertain whether all COARs that are written are even provided to her office for inclusion in an employee's file because these documents do not make reference to the performance of the employee. *Id.* at 279.

In sum, the Board's conclusion that Bettucci failed to demonstrate that he was prejudiced by either the delay in including the MOP in his evaluation file or the decision not to include the COARs in this file is supported by substantial evidence. Similarly, Bettucci's claim that certain individuals should not have participated on the 1987 STB because they were in competition for employment with Bettucci is equally without merit and supported by Bettucci with only conjecture and surmise.

vii. Whether the AID Violated Applicable Rules, Regulations or Policies in the Decision to Mandatorily Retire Bettucci or in the Implementation of that Decision

 Finally, Bettucci contends that certain errors in the proceedings permitted the PSB decision to be based on his corridor reputation and that Robert Halligan, Director of the Office of Personnel Management, failed to make an independent assessment of the validity of the PSB's recommendation. Bettucci asserts that Halligan had an obligation to determine whether any information unknown to the PSB affected their decision. Opp. to Mot. to Affirm at 192. Bettucci alleges that Halligan was aware of his corridor reputation and the fact that it had been improperly used by the Assignment Boards to deny Bettucci overseas assignments and a fair opportunity to show his capabilities and performance. *Id.* However, the record is devoid of any suggestion that Halligan acted improperly in this regard. *See generally* ROP, Part III, April 26, 1989 Trans. at 157–205 (testimony of Halligan).

Bettucci also argues that he was in a shortage category for executive officers and that the Agency continued to recruit and hire for this position. For this reason, Bettucci claims that Halligan should not have accepted the PSB's recommendation. In response to this argument, the Board concluded that the actions by Halligan were management decisions committed to the discretion of Halligan. This court must defer to judgment of the Board on this issue as there is no evidence in the record suggesting that this conclusion was inappropriate.

III. Conclusion

In light of the exhaustive review of the record in this case and the consideration of the 194 page filing by Bettucci opposing the Motion to Affirm the Decision of the Grievance Board, it is this court's conclusion that the conclusions reached by the Foreign Service Grievance Board are supported by substantial evidence. It is noteworthy that Bettucci's arguments are supported predominantly by conjecture and speculation, while the Board engaged in a thorough review of the record before it and went to great lengths to insure that Bettucci was presented with every opportunity to establish his case. Accordingly, for the reasons set forth herein, defendants' Motion to Affirm the Decision of the Foreign Service Grievance

Board is GRANTED. A separate order shall issue this date.

### ORDER

This matter comes before the court on defendants' Motion to Affirm the Decision of the Foreign Service Grievance Board. For the reasons set forth in the accompanying memorandum opinion, defendants' motion is GRANTED. Plaintiff's objections to the Magistrate Judge's Report and Recommendation are without merit. Upon de novo review, the Report and Recommendation is hereby ACCEPTED and the decision of the Foreign Service Grievance Board is hereby AFFIRMED. Judgment shall be entered for defendants and this case now stands DISMISSED WITH PREJUDICE.

SO ORDERED.